IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE FEMATT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 11 CV 1530 |
| ) | |
| ) | Judge |
| The CITY OF CHICAGO, Illinois, a municipal ) | |
| Corporation, and MARGARET HOPKINS, ) | Magistrate Judge |
| #5455, DONOVAN MARKIEWICZ, #17092, ) | |
| WILLIAM MORALES, #15318, TIMOTHY ) | |
| PARKER, #6499, PAUL ZOGG, #9345, ) | |
| KEITH HERRERA, #17289, and JEROME ) | |
| FINNIGAN, #5167, ) | |
| ) | |
| Defendants. ) | |

## **COMPLAINT**

Plaintiff, by and through his attorneys, The Hamilton Law Office, LLC, makes the following complaint against Defendant CITY OF CHICAGO, ("Defendant City") and Defendant Chicago Police Officers (or former Chicago Police Officers) MARGARET HOPKINS, DONOVAN MARKIEWICZ, WILLIAM MORALES, TIMOTHY PARKER, PAUL ZOGG, KEITH HERRERA and JERMOME FINNIGAN ("Defendant Officers"):

## JURISDICTION AND VENUE

1.  This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2.  This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343.

3.  Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

## THE PARTIES

4. Plaintiff Jose Fematt is a nineteen-year-old resident of the City of Chicago, Illinois.

5. Defendant City is a municipal corporation incorporated under the laws of the State of Illinois.

6. Defendant Officers, are or were, at all times relevant to this complaint, Chicago Police officers, employed by the City of Chicago and acting under color of law and within the scope of their employment.

## FACTS

7. In August of 2005, when plaintiff thirteen years' old, he lived with his mother and younger sister in the first floor apartment at 2032 North Keeler, Chicago, Illinois.

8. On the night of August 12, 2005, Plaintiff and his sister were at home inside their apartment. Their mother was at work.

9. Plaintiff and his sister were in their pajamas, watching television together on the couch in their living room when Plaintiff saw flashlights and heard noises outside.

10. Shortly thereafter, Defendant Officers broke down Plaintiff's front door and entered Plaintiff's apartment without a warrant, or any other legal justification to do so.

11. Defendant Officers pointed guns at the two children and yelled at them.

12. Without legal justification, Defendant Officers searched Plaintiff and his apartment.

13. Defendant Officers placed Plaintiff in excessively tight handcuffs and forced him to go outside into the front hallway of his building.

14. Defendant HOPKINS ordered him to sit on the front stairs while she and other Defendant Officers questioned Plaintiff at length about his upstairs neighbor.

15. Defendant Officers did not have reasonable suspicion or probable cause, or any other legal justification to stop, search, or question Plaintiff.

16. Defendant HOPKINS and other Defendant Officers then forced Plaintiff, handcuffed, barefoot and still in his pajamas, outside and into the back of a Chicago Police car.

17. Plaintiff was worried about his sister who was only four years old at that time, and who was still inside the apartment with the other Defendant Officers, but Defendant Officers would not allow Plaintiff to go to his sister.

18. Defendant Officers had placed the handcuffs around Plaintiff's wrists so tightly that he could not sit upright in the back of the police car because sitting placed too much pressure on his handcuffed wrists. Plaintiff had to lay down in the back seat in order to relieve the pressure on his wrists.

19. Defendant Officers left Plaintiff in the back of the police car like this for some unknown period of time.

20. Then Defendant HOPKINS got into the police car and started to drive.

21. Plaintiff did not know where Defendant HOPKINS was taking him or why.

22. Defendant HOPKINS drove Plaintiff around the neighborhood threatening Plaintiff and insisting that he give her information about his upstairs neighbor and about drugs in his apartment building.

23. After several minutes, Defendant HOPKINS returned with Plaintiff to 2032 North Keeler, Chicago, Illinois.

24. Defendant HOPKINS then took Plaintiff, still tightly handcuffed, back into the front hallway of his apartment building and ordered him to sit on the steps again, while her partner Defendant Officers continued their search of 2032 North Keeler.

25. Sitting on the stairs caused Plaintiff additional pain to his wrists.

26. After some time, Defendant HOPKINS warned Plaintiff that if anyone came asking what he saw here tonight that he better not tell anyone, or else, she threatened, she and her fellow

Defendant Officers would come after him and put him in jail for a long time.

27. Plaintiff was then released from the handcuffs and allowed to return to his apartment.

28. Plaintiff's apartment was in total disarray when he returned. Defendant Officers had ransacked his family's apartment; all the drawers and closets had been emptied onto the floor. Their television had been smashed, and it and many other of his family's belongings were broken and laying on the floor.

29. When Plaintiff's mother arrived home from work later that night, Plaintiff was standing in the middle of a ruined apartment, frightened, wide-eyed and awake in the middle of the night.

30. The handcuffs left circular abrasions around Plaintiff's wrists and they remained red and swollen for several days after the handcuffs were removed.

31. Plaintiff and his family left their apartment that night and Plaintiff never returned. Unable to stay there for fear Defendant Officers would return, Plaintiff stayed with other family members until his mother found them a new apartment.

## The Pattern of Misconduct

32. Officers assigned to the Special Operations Section ("SOS") were given free range by the Department to violate the law in order to bring in high numbers or arrests, guns, and drugs.

33. The SOS's Standing Operating Procedure stated that officers who did not have high enough productivity (bringing in arrests, guns, etc.) would be removed from the unit.

34. The SOS officers were allowed to abuse citizens and the criminal court processes by, among other things, using excessive force, making false arrests and police reports, stealing, fabricating and/or withholding evidence, and illegally searching homes and property.

35. The SOS unit employed the practices enumerated above openly and with impunity, and its officers were even encouraged to do so.

36. On approximately June 25, 1999, the Commanding Officer of the Special Operations Section issued a memorandum instructing that if SOS officers were questioned by Department inspectors about their compliance with Departmental policies, they should practice their stories together prior to giving a statement. The memorandum goes on to state that he would "back" the officers whether they were right or wrong. That memorandum became a part of the unit's Standard Operating Procedures Packet.

37. Going back to at least 2002, the Chicago Police Department amassed hundreds of complaints related to the above practices by the Special Operations Section officers, but routinely "not-sustained" or "unfounded" them without any thorough investigation.

38. Members of the SOS unit themselves were frequently assigned to be the "investigators" of the complaints of misconduct by their fellow SOS officers.

39. After years without any action by the Department, in approximately 2006, the Cook County State's Attorney's Office noticed the pattern in the criminal cases brought by the SOS officers.

40. Unlike the Department, the State's Attorney's Office took action. It investigated and criminally indicted SOS officers for the same pattern of misconduct at issue here.

41. In August 2006, the Cook County State's Attorney's Office filed criminal charges against defendants Herrera, Finnigan, and Hopkins alleging that they engaged in criminal acts similar to the events described above.

42. In January 2007, a Cook County Grand Jury returned indictments of Defendants HERRERA, FINNIGAN, and HOPKINS, for armed violence, residential burglary, theft, aggravated unlawful restraint, unlawful arrest, obstructing justice, and official misconduct.

43. On September 23, 2009, Defendant HOPKINS pleaded guilty to fabricating police reports in order to justify Defendant Officers' unlawful entry into the Keeler residence, among other

5

things. HOPKINS admitted that she formed an agreement with other officers, including, but not limited to, Defendants FINNIGAN, MARKIEWICZ, and HERRERA, to cover up the misconduct of the Defendant Officers and that Defendant FINNIGAN led the discussion about the conspiracy.

## The City's Deliberate Indifference

44. The City of Chicago maintains a de facto policy, practice and custom of failing to properly train, supervise, discipline and control its officers, which was the moving force behind the violations of the Plaintiffs' constitutional rights.

45. The City Council is the final policymaker for the Chicago Police Department. Within the City Council, the Committee on Police and Fire has jurisdiction over all matters relating to the Police Department.

46. The Superintendent to the Police is the chief executive officer of the police department. By authority delegated to him by municipal ordinance, he has the authority to issue department directives, to issue instructions to the CPD's employees, and to take disciplinary action against the employees.

47. Municipal policy-makers have long been aware of the City's policy and practice of failing to properly train, monitor and discipline its police officers who engage in misconduct.

48. In 1999, following two high profile incidents of excessive force, the City Council held public hearings on the prevalence of excessive force, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

49. On September 28, 1999, the then Superintendent of police gave a speech highlighting problems with the City of Chicago's policies and practices relating to the use of force. Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of

force; (2) early detection of potential problem officers; (3) an effective disciplinary system, and (4) officer accountability for the use of force.

50. In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

51. A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board.

52. Two years later, a federal jury in the case of *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 22175618, at *2 (N.D. Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department. The "City of Chicago's custom and practice of not adequately investigating, disciplining, or prosecuting off duty Chicago police officers who use excessive force against individuals" was found to have directly caused the constitutional harm. *Id.* at *1.

53. Phillip Cline, the Superintendent of the City of Chicago's Police Department at the time of the events complained of herein, was aware of a pattern of alleged misconduct within the Special Operations Section, including by the Defendant Officers, but took no action to remove the Defendant Officers from street duty. Further, Cline failed to alert prosecutors and/or the plaintiff or plaintiffs' criminal defense attorneys of a pattern of misconduct by the Defendant Officers before or during the criminal proceedings against Plaintiffs.

54. Cline did not communicate the pattern of allegations of misconduct by the SOS officers to the City's Police Board or the City Council before August 12, 2005, when Defendant Officers invaded Plaintiff's home and carried him away in a CPD vehicle.

55. In 2007, the City held a press conference in which then-Superintendent Cline and head of Internal Affairs, Debra Kirby, publicly acknowledged the pattern of SOS misconduct and that the Department had been aware of the problem since 2003.

56. In the summer of 2008, Police Superintendent Weiss gave the following statement on the nationally broadcast television program 60 Minutes:

> "I think there probably was an atmosphere that, 'Hey, we're above the law. We're getting great stats. We're pulling guns off the street, we're taking down drug dealers. Yeah, maybe we are breaking the rules, maybe we are breaking the laws, but look what we've accomplished.' They lost their way, and it saddens me because supervisors have a lot of power, and if they're encouraging their people to engage in misconduct, or actually in some instances, to even engage in criminal activity, that is horrific, in my eyes."

57. Although the City of Chicago had long been aware that its supervision and discipline of police officers was entirely inadequate, as of May 18, 2006 it had not enacted any measures to address that failure. Redress that was specifically promised by the City Council and the Superintendent went unfilled.

58. For example, the City failed to institute any system for recognizing problem officers or to ensure an effective disciplinary system.

59. At the time of the events at issue in this case, the Department had not implemented any written policy, practice or procedure to conduct pattern analysis of complaints of misconduct against Chicago police officers. Thus, officers such as those in the Special Operations Sections were able to accumulate large numbers of complaints of similar misconduct without fear of disciplinary action.

8

60. At the time of the events at issue in this case, the City's Police Board did not have in place a protocol whereby its members received notice of a pattern of, or number of, complaints, lawsuits, and/or settlements against officers for whom discipline was recommended.

61. At the time of the events at issue in this case, the City's Police Superintendent did not have in place a protocol whereby he received notice of a pattern of, or number of, complaints, lawsuits, and/or settlements against officers for whom discipline was recommended.

62. As a result of the City's policies, practices and customs, its officers were emboldened by their knowledge that they were "above the law" and would not be held accountable for their misconduct.

63. At the time of the events described above, the Defendant Officers knew that the City would not subject them to any meaningful investigation and discipline. Their misconduct in this case was a direct result of the City's failure to adequately discipline and control its officers.

## COUNT I
(42 U.S.C. § 1983: Unlawful Search)

64. Each of the foregoing paragraphs is incorporated as if fully restated here.

65. As more fully described above, Defendant Officers entered and searched Plaintiff's home and Plaintiff himself, without a warrant, probable cause, or any other legal justification to do so, in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

66. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

67. On information and belief, one or more of Defendant Officers who did not participate in the unlawful search of Plaintiff and/or his home, and had a reasonable opportunity to intervene to prevent harm to Plaintiff, but failed to do so.

68. As a direct and proximate result of this illegal search, Plaintiff suffered damages, including emotional damages, which will be proven at trial.

9

WHEREFORE, Plaintiff prays for judgment against Defendant Officers and in a fair and just amount sufficient to compensate him for the injuries he has suffered. Plus, Plaintiff seeks a substantial sum in punitive damages against Defendant Officers, costs and reasonable attorney fees, and all such other relief as this Court finds just and equitable.

## COUNT II
(42 U.S.C. § 1983: Unlawful Seizure/False Arrest)

69. Each of the foregoing paragraphs 1-63 is incorporated as if fully restated here.

70. As more fully described above, Defendant Officers detained Plaintiff, without a warrant, probable cause, or any other legal justification to do so, in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution.

71. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

72. On information and belief, one or more of Defendant Officers who did not participate in the unlawful seizure of Plaintiff, had knowledge of the unlawfulness of his or her fellow officers' actions, and had a reasonable opportunity to intervene to prevent harm to Plaintiff, but failed to do so.

73. As a direct and proximate result of this illegal seizure, Plaintiff suffered damages, including emotional damages, which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendant Officers and in a fair and just amount sufficient to compensate him for the injuries he has suffered. Plus, Plaintiff seeks a substantial sum in punitive damages against Defendant Officers, costs and reasonable attorney fees, and all such other relief as this Court finds just and equitable.

## COUNT III
(42 U.S.C. § 1983: Excessive Force)

74. Each of the foregoing paragraphs 1-63 is incorporated as if fully restated here.

75. As more fully described in the preceding paragraphs, the intentional conduct of Defendant Officers toward Plaintiff was objectively unreasonable and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

76. The misconduct described in this count was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

77. On information and belief, one or more of Defendant Officers were aware of their fellow officers' use of excessive force against Plaintiff, had a reasonable opportunity to intervene to prevent it, but failed to do so.

78. As a direct and proximate result of Defendant Officers' use of excessive force, Plaintiff suffered physical and emotional damages which will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendant Officers in a fair and just amount sufficient to compensate Plaintiff for the injuries he has suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

### COUNT IV
(42 U.S.C. Section 1983: Conspiracy to Deprive Constitutional Rights)

79. Each of the foregoing paragraphs is incorporated as if fully restated here.

80. As described more fully above, the Defendants reached an agreement to unlawfully enter and search Plaintiff's home and his person, and to unlawfully detain Plaintiff, and use excessive force against him, and thereby deprive Plaintiff of his Constitutional rights, all as described more fully throughout this Complaint.

81. Each of the Defendant Officers further conspired to cover up their misconduct with respect to their actions at 2032 North Keeler on August 12, 2005.

82. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

83. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

84. As a result of the Defendants' conduct, Plaintiff suffered pain and injury, as well as emotional distress, and a deprivation of his liberty.

WHEREFORE, Plaintiff prays for judgment against Defendant Officers in a fair and just amount sufficient to compensate Plaintiff for the injuries he has suffered, plus a substantial sum in punitive damages, as well as costs, attorney's fees, and such other relief as is just and equitable.

## COUNT V
(42 U.S.C. § 1983: *Monell* Policy Claim Against the City of Chicago)

85. Each of the foregoing paragraphs is incorporated as if fully restated here.

86. The misconduct described in the preceding paragraphs was undertaken pursuant to the policy and practice of the Chicago Police Department in that:

    a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately discipline, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

    b. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago police officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff; specifically, Chicago police officers accused of misconduct can be confident that the Department will not investigate those accusations in earnest, and will refuse to recommend discipline even where the Officer has engaged in misconduct;

    c. Generally, as a matter of widespread practice so prevalent as to comprise

municipal policy, officers of the Chicago Police Department abuse citizens in a manner similar to that alleged by Plaintiff on a frequent basis, yet the Chicago Police Department makes findings of wrongdoing in a disproportionately small number of cases;

      d.   Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case;

      e.   As a matter of express policy, the City of Chicago does not retain any records which are more than seven years old documenting allegations of excessive force against police officers, thereby preventing the City from ascertaining any patterns of abuse which might develop over the course of a police officer's career; and

      f.   Further, the City fails to utilize even the records that are retained to identify and respond to patterns of misconduct by its officers.

87. As a proximate result of the above-detailed actions of Defendants, Plaintiff was injured, including physical injuries and emotional distress.

WHEREFORE, Plaintiff requests that judgment be entered in favor of Plaintiff and against the Defendant City and that plaintiff be awarded compensatory damages, reasonable attorneys' fees, costs, and expenses.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

                Respectfully Submitted,

                JOSE FEMATT, Plaintiff,

      By:   /s/ Torreya L. Hamilton
            Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
11 South LaSalle St., Suite 1000
Chicago, IL 60603
312.726.3173
Attorney No.: 6229397

13